1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10
11

RICHARD V. ROOD,

No.  2:13-CV-0478-JAM-DMC-P

12

Plaintiff,

13

v.

<u>FINDINGS AND RECOMMENDATIONS</u>

14

WIN, et al.,

15

Defendants.

16
17

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18

42 U.S.C. § 1983.  Pending before the Court are Defendants' motion for summary judgment, ECF

19

No. 77, Plaintiff's opposition, ECF No. 86, and Defendants' reply, ECF No. 87.  The undersigned

20

recommends Defendants' motion for summary judgment be granted.

21
22

**I.  BACKGROUND**

23

A.      <u>**Plaintiff's Allegations**</u>

24

Plaintiff named 46 defendants in his first amended complaint.  <u>See</u> ECF No. 33,

25

pgs. 1-17.  The Court narrowed this list down to eight:  (1) S. Hannies; (2) Richard Tan; (3) E.

26

Fontillas; (4) F. Hardman; (5) Khin Win; (6) Kiesz; (7) J. Herhst; and (8) C. Braunger

27

("Carlson").  <u>See</u> ECF No. 45.  Defendants Win, Tan, Fontillas, Carlson, and Hardman move for

28

summary judgment.  <u>See</u> ECF 77, pg. 1.  Therefore, the undersigned will direct the analysis

towards Defendants Tan, Fontillas, Hardman, Win, and Carlson only and will not address

Plaintiff's claims against Defendants Hannies, Kiesz, and Herhst.[1]

Plaintiff alleges Eighth Amendment claims against each of the five moving

Defendant (Defendant's Win, Tan, Fontillas, Carlson, and Hardman).  See ECF No. 33, pgs. 1-17.

Plaintiff contends that while housed at the Shasta County Jail Dr. Craig diagnosed him with

having an ACL tear in his right knee and LDD of his L3 and L6 vertebrae.  See id. at 3.  Plaintiff

was informed he would have to wait until he arrived at his permanent housing facility before

receiving treatment.  See id. at 3-4.  Plaintiff claims the Defendants ignored Dr. Craig's diagnosis,

dismissed Plaintiff's medical complaints, and blocked Plaintiff's access to medical personnel, and

that their actions amount to deliberate indifference to a serious medical injury in violation of the

Eighth Amendment.  See id. at 3-15.

            1.    <u>Plaintiff's Allegations Against Each Moving Defendant</u>

                a.    <u>Defendant Tan</u>

Plaintiff states the following concerning Defendant Tan:

> On December 21, 2010, Defendant R. Tan, M.D., reviewed Plaintiff's CDCR 7277 . . . and noted plaintiff's complaint of a serious medical need, and <u>HISTORY OF AN ACL TEAR IN THE RIGHT KNEE</u>, and that <u>NO MEDICAL REFERRALS</u> were being made regarding plaintiff's complaint of a serious medical need.  Defendant Tan also reviewed plaintiff's CDCR 7371 Health Care Transfer Information form, which was completed by medical personnel at HDSP, and <u>DOCUMENTED PLAINTIFF'S PREVIOUSLY DIAGNOSED SERIOUS MEDICAL COMPLAINT OF AN ACL TEAR IN THE RIGHT KNEE.</u>
>
> Defendant Tan, instead of alerting additional medical personnel of plaintiff's serious medical needs, or taking <u>ANY</u> steps to ensure that plaintiff receive the medical attention that his <u>DOCUMENTED</u> injury required, simply allowed [sic] custody staff to house plaintiff wherever they wanted, without taking into account plaintiff's inability to climb into the upper bunk, or request for a "lower bunk, lower tier" chrono.
>
> Defendant Tan abandoned his medical duty to plaintiff, even after noting the <u>DOCUMENTED</u> serious medical needs of plaintiff, because he believed plaintiff was faking his symptoms and complaint in order to receive pain medication.

---

[1]    Defendants Hannies, Kiesz, and Herhst have not been served.  Service of process was returned unexecuted as to Defendants Kiesz and Hannies on December 19, 2019.  See ECF No. 58.  Service of process was returned unexecuted as to Defendant Herhst on January 23, 2020.  See ECF No. 64.  The Court will recommend these three defendants be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to effect timely service of process.

2

1

> The failure of Defendant Tan to conduct an adequate examination of plaintiff, or take the necessary steps to ensure plaintiff receive the needed medical treatment, despite defendant Tan's actual knowledge of plaintiff's serious medical needs, constitutes deliberate indifference to plaintiff's serious medical needs.
> As a result of defendant Tan's deliberate indifference, plaintiff suffered further injury, physical and emotional pain and suffering, as well as life altering physical disability.

2

3

4

5

Id. at 6.

6

7

Plaintiff alleges more facts concerning Defendant Tan below.

8

b.      Defendant Fontillas

9

Plaintiff alleges that on December 28, 2010, Plaintiff was seen by a nurse,

10

Defendant Fontillas.  See id. at 7.  Defendant Fontillas "was acting as the 'gate keeper' to access

11

the doctor."  Id.  Plaintiff informed Defendant Fontillas that he had been diagnosed with a torn

12

ACL and that it was documented in Plaintiff's medical file.  See id.  Plaintiff also told Defendant

13

Fontillas that Plaintiff's pain medication was not helping his "severe and debilitating pain, which

14

consisted of a steady, deep throbbing pain centered in his right knee, which made it very difficult

15

to concentrate, write a letter or even sleep at night."  See id.  Additionally, Plaintiff requested a

16

lower bunk due to his knee problems.  See id.  Plaintiff contends that Defendant Fontillas did not

17

address any of Plaintiff's concerns but "simply took plaintiff's vital signs and informed plaintiff

18

that he would have to request a 'lower bunk, lower tier' chrono from the doctor."  Id.  Defendant

19

Fontillas allegedly told Plaintiff that he was scheduled to see a doctor on December 31, 2010.

20

See id.

21

Plaintiff claims that Defendant Fontillas' failure to alert the proper medical

22

personnel of Plaintiff's "DOCUMENTED serious medical needs . . . constitutes deliberate

23

indifference to plaintiff's serious medical needs."  See id.  "As a result of defendant Fontillas'

24

deliberate indifference, plaintiff suffered further injury, physical and emotional pain and

25

suffering, as well as a life altering physical disability."  Id. at 7-8.

26

/ / /

27

/ / /

28

/ / /

1

c.    Defendant Hardman

2          Plaintiff states that on January 2, 2011, Plaintiff submitted a CDCR 7362 Health

3    Care Services Request Form requesting to see a doctor for Plaintiff's "serious medical needs as

4    plaintiff was in extreme pain and suffering and his current pain medication was not working," for

5    Plaintiff was unable to see a doctor on December 31, 2010.  See id. at 8.  On January 4, 2011,

6    Plaintiff was seen by another nurse, Defendant Hardman.  See id.  Defendant Hardman was also

7    acting as "gate keeper" to see the doctor.  See id.  Plaintiff's allegations against Defendant

8    Hardman are a mirror image of his allegations against Defendant Fontillas.  See id. at 8-9.  The

9    one difference is that after Defendant Hardman took Plaintiff's vitals and ignored Plaintiff's

10   concerns, Defendant Hardman said that Plaintiff would be "seen by Dr. Win on the 11th and you

11   can request a 'lower, lower' chrono then."  See id. at 8.

12

d.    Defendant Win

13         On January 11, 2011, Plaintiff was seen by a doctor, Defendant Win.  See id. at 9.

14   "Prior to plaintiff arriving for his appointment with defendant Win, defendant Win had already

15   formed the opinion that plaintiff was faking his symptoms and complaint of severe and

16   debilitating pain in order to receive pain medication."  Id.  Plaintiff informed Defendant Win that

17   he had been diagnosed with a torn ACL and that it was documented in Plaintiff's medical file.

18   See id.  Plaintiff also told Defendant Win that Plaintiff's pain medication was not helping his

19   "severe and debilitating pain, which consisted of a steady, deep throbbing pain centered in his

20   right knee, which made it very difficult to concentrate, write a letter or even sleep at night."  See

21   id.  Additionally, Plaintiff requested a lower bunk due to his knee problems.  See id.

22         "Defendant Win began by telling plaintiff, 'This is a new facility and we will

23   make our own diagnosis.  It is very unlikely that it is an ACL tear, because you are experiencing

24   pain.'"  Id.  Plaintiff alleges that Defendant Win did a "cursory examination" of Plaintiff's knee

25   and "declared that plaintiff did not have an ACL tear."  Id.  Defendant Win increased Plaintiff's

26   pain medication "from 200 mg Ibuprophen [sic] to 400 mg."  Id.  This is after Plaintiff informed

27   Defendant Win that "the Ibuprophen [sic] was not working and upset his stomach."  Id.

28   Defendant Win then "referred plaintiff for 'physical therapy' to help lessen the pain in plaintiff's

4

1    right knee." Id. at 9-10.

2         "Defendant Win NEVER attempted to diagnose plaintiff's medical complaint of

3    previously diagnosed, and DOCUMENTED, ACL tear and severe and debilitating pain because

4    defendant Win believed plaintiff was fakinf [sic] his symptoms and medical complaint in order

5    to receive pain medication." Id. at 10.  Plaintiff alleges that Defendant Win's failure to conduct

6    an adequate examination of Plaintiff, "despite defendant Win's actual knowledge of plaintiff's

7    serious medical needs, constitutes deliberate indifference to plaintiff's serious medical nedds

8    [sic]." Id.  Plaintiff contends that as a result "plaintiff suffered further injury, physical and

9    emotional pain and suffering, as well as a life altering physical disability." Id.

10                    e.      Defendant Braunger ("Carlson")

11   Plaintiff alleges the following concerning Defendant Carlson:

12           On February 27, 2011, Plaintiff submitted yet another CDCR 7362
         Health Care Services Request Form stating, 'This is the 4th 7362 I have
13       sent in to see the doctor about my knee.  I have been to RN line twice in
         the last month and each one I saw said I'll be ducated [sic] in a couple of
14       days.  I have not been ducated [sic] yet.  Need to see the doctor ASAP.'
             On March 1, 2011, defendant C. Braunger, RN, received and
15       processed plaintiff's CDCR 7362, however, defendant Braunger did not
         ducat [sic] plaintiff to 'nurses line.'  Instead, defendant Braunger ignored
16       plaintiff's medical request.
             The failure of defendant Braunger to properly process plaintiff
17       CDCR 7362 Health Care Services Request Form and alert the proper
         medical personnel of plaintiff's well DOCUMENTED serious medical
18       need, despite defendant Braunger's actual knowledge, constitutes
         deliberate indifference to plaintiff's serious medical needs.
19           As a result of defendant Braunger's deliberate indifference to
         plaintiff's serious medical needs, plaintiff suffered further injury, physical
20       and emotional pain and suffering, as well as a life altering physical
         disability.
21

22       Id. at 12.

23       2.      Plaintiff's Allegations Relating to Further Injuries

24           On March 2, 2011, while attempting to climb into his upper bunk, Plaintiff's right

25   knee "gave out and buckled, causing plaintiff to fall, striking the toilet and injuring his wrist and

26   ribs." Id. at 13.  "On March 10, 2011, based solely on plaintiff falling while trying to get into the

27   upper bunk, defendant Win requested an MRI of plaintiff's right knee to 'rule out a meniscus

28   injury.'" Id.  "On May 24, 2011, plaintiff finally received an MRI of his right knee.  The MRI

                                                    5

revealed that plaintiff did, in fact, have an ACL tear.  In fact, it was much worse than just an ACL tear."  Id.  Plaintiff alleges that had Defendants done their jobs, Plaintiff would not have been forced to languish in his cell, "in severe and debilitating pain, without sufficient pain medication."  Id.

However, "[e]ven after the MRI confirmed that plaintiff had an ACL tear, and was in severe and debilitating pain, defendants continued to operate under the assumption that plaintiff was faking the extent of his pain in order to receive stronger pain medication."  Id. at 14.

"On October 14, 2011, plaintiff underwent reconstructive surgery, at Doctors Hospital of Manteca."  Id.  "Following surgery, plaintiff continued to experience extreme pain in his right knee for some reason.  The pain continued to worsen, yet defendants would not increase pain medication."  Id.

Plaintiff alleges:

> On or about July 7, 2012, plaintiff went to stand up and his right knee suddenly gave out and began to swell.  It felt as if something was trying to poke through plaintiffs [sic] skin.  Plaintiff could only move his leg to a certain point and then it would feel like something would break if he attempted to extend it any further.
> On July 27, 2012, Plaintiff was seen by defendant R. Tan, MD, for his complaint of continued pain in his right knee and the more recent issue of it feeling like something was trying to poke through the skin.  Plaintiff explained to defendant Tan how it felt and that the object felt sharp.
> Defendant Tan told plaintiff, "That's normal.  It is due to scar tissue and your knee will continue to be stiff.  Defendant Tan NEVER attempted to diagnose plaintiffs [sic] complaint, nor did defendant Tan conduct any type of examination regarding Plaintiff's medical complaint.
>
> * * *
>
> On August 6, 2012, after repeated complaints to defendant Tan of severe right knee pain and something loose in plaintiff [sic] knee, plaintiff was referred to Dr. Casey for a follow-up consult regarding the continued complaint of pain.
>
> * * *
>
> On November 6, 2012, plaintiff was finally given a postop MRI.  The result of this MRI revealed that plaintiff would need addition [sic] surgery to remove the 13 mm loose body from his knee, which was the cause of his ongoing pain issue.
> On January 25, 2013, plaintiff had additional surgery to remove the 13 mm loose body from his knee.

Id. at 14-15.

6

Plaintiff concludes stating:

> Due to defendants [sic] deliberate indifference to plaintiff [sic] serious medical needs, plaintiff was forced to undure [sic] prolonged extreme pain and suffering because defendants did not attempt to diagnose plaintiff's complaints because defendants believed plaintiff was faking his symptoms in order to receive pain medication.  No reasonable person would have believed plaintiff was faking his symptoms, given that plaintiff had a previously diagnosed ACL tear <u>DOCUMENTED</u> in his medical records, which defendants choose to disregard and ignore.

<u>Id.</u>

## II.  THE PARTIES' EVIDENCE

A.    <u>Defendants' Evidence</u>

Defendants' motion for summary judgment is supported by the sworn declarations of Defendants Carlson, ECF No. 77-3, Hardman, ECF No. 77-4, Tan, ECF No. 77-5, Win, ECF No. 77-6, and Fontillas, ECF No. 77-7.  Additionally, Defendants rely on the sworn declaration of their attorney, Jason R. Cale, ECF No. 77-8.  Defendants further rely on the following exhibits attached to the Cale declaration:

| | | |
|---|---|---|
| <u>Exhibit A</u> | First Amended Complaint.  ECF No. 77-8, pgs. 3-22. |
| <u>Exhibit B</u> | Mercy Medical Records.  ECF No. 77-8, pgs. 23-30. |
| <u>Exhibit C</u> | Deposition of Richard Rood.  ECF No. 77-8, pgs. 31-45. |
| <u>Exhibit D</u> | CDCR Medical Records.  ECF No. 77-8, pgs. 46-149. |

Defendants contend: (1) they timely and properly treated Plaintiff's right knee injury on those occasions that they saw him; (2) Defendants adequately addressed Plaintiff's complaints of pain; (3) Plaintiff was provided a lower bunk accommodation upon request; (4) Plaintiff cannot establish that his damages are supported as they are speculative; and (5) Defendants are entitled to qualified immunity.  ECF No. 77, pg. 1.

/ / /

/ / /

/ / /

/ / /

7

In support of these contentions, Defendants offer a Statement of Undisputed Facts in which they state the following facts are undisputed:

1.      Plaintiff was involved in a bicycle accident in 2008, following which he was treated at Mercy Medical Center in Redding, California, and was diagnosed with a right knee sprain.

2.      While housed at the Shasta County Jail in 2009, Plaintiff's right knee buckled causing further injuries.

3.      Plaintiff alleges that, after this incident in 2009, he received treatment from "Dr. Craig" who diagnosed Plaintiff with a right-knee ACL tear.  No records have been located confirming this diagnosis or that "Dr. Craig" is a licensed physician qualified to make a diagnosis of an ACL tear.

4.      In September 2010, Plaintiff was transferred to High Desert State Prison (HDSP).

5.      On October 7, 2010, an x-ray of Plaintiff's right knee was performed and indicated no change from Plaintiff's prior exam in July 2010.  Specifically, the October 2010 images revealed that Plaintiff's right knee as "stable negative."  A lower spine x-ray also revealed "negative lower spine" with no issues noted.

6.      On October 21, 2010, Plaintiff was treated by a nurse at HDSP for a complaint of right-knee ACL tear.  At the time, Plaintiff stated his pain, which he described as a "dull ache," was a 7.5 out of 10.  His condition was noted as stable and Plaintiff was referred to follow up with his physician concerning further treatment or to resubmit a healthcare services request if the pain increased.

7.      On December 21, 2010, Plaintiff was transferred from HDSP to California State Prison – Solano (CSP-Solano).

8.      An initial health screening form provided by HDSP to CSP-Solano, dated December 21, 2010, indicated that Plaintiff had "an ACL tear" and lower back pain, but also indicated Plaintiff had "pending chronic need care" without indicating any need for urgent care.  The form did not indicate Plaintiff had any pending specialist appointments or clinical follow-up appointments, but indicated that a follow-up was recommended in four weeks.

9.      Dr. Tan reviewed the initial health screening form and Plaintiff's medical record and indicated in his December 21, 2010, report that Plaintiff had no active medications at the time of his transfer other than Ibuprofen, that Plaintiff had a history of an ACL tear, and that Plaintiff should be scheduled for a follow-up with the primary care physician in four weeks.

10.      On December 27, 2010, Plaintiff was treated by Nurse Fontillas after submitting a request for health services form.  Plaintiff complained of chronic back pain and was provided Ibuprofen.

8

11.     On January 4, 2011, Nurse Hardman responded to a heath service request form submitted by Plaintiff indicating chronic right knee and lower back pain.  Plaintiff's vitals were taken, and chart notes indicated that Plaintiff was scheduled for an appointment with his primary care physician on January 11, 2011.

12.     Plaintiff was treated and evaluated by Dr. Win, Plaintiff's primary care physician while at CSP-Solano, on January 11, 2011.  Dr. Win indicated Plaintiff had a right-knee meniscus injury, but stated it was unlikely Plaintiff had an ACL tear.  Dr. Win noted Plaintiff told him another doctor had stated he has an ACL tear and needed surgery to repair it.  Dr. Win performed a physician assessment and noted that Plaintiff's gait was normal and Plaintiff had no difficulty getting on and off the chair.  Dr. Win ordered physical therapy and provided Plaintiff with a prescription for Naproxen for pain.

13.     On January 28, 2011, Plaintiff was treated by Nurse Carlson for right knee pain.  Chart notes from this visit state that Plaintiff had been prescribed Naproxen earlier for pain and Plaintiff should submit a health care services request form if his symptoms persist or his pain increases.  At the time of the exam, Plaintiff was ambulatory and stable, and was returned to his housing unit with a request that he follow up in the clinic with his primary care physician.  Plaintiff described his pain as a 6 out of 10.

14.     On February 27, 2011, Plaintiff submitted a healthcare services form requesting to be provided an appointment to see Dr. Win.  Nurse Carlson signed chart notes on March 1, 2011, indicating Plaintiff was scheduled to see Dr. Win on March 10, 2011.

15.     Plaintiff was seen by Dr. Win on March 10, 2011.  At the time, Plaintiff complained of further pain in his right knee, which he indicated had been exacerbated due to another recent fall eight to nine days prior when he slipped trying to climb into his upper bunk.  Dr. Win ordered an x-ray which was taken the same day.

16.     The x-ray indicated "no fracture, dislocation, or focal osseous lesion, along with no joint effusion."  The impression further indicated "negative knee."

17.     Dr. Win saw Plaintiff later that same day (March 10, 2011) and scheduled a further x-ray to confirm that no metallic materials were in Plaintiff's body in order to clear Plaintiff for an MRI.  The second x-ray was taken on March 25, 2011, and Plaintiff was cleared for an MRI with an outside specialist.

18.     On March 21, 2011, Nurse Fontillas indicated in response to a further health services request by Plaintiff that Plaintiff was awaiting diagnostic testing results, which Dr. Win reviewed that day.  The testing results indicated that Plaintiff's right knee was normal.

19.     Nurse Fontillas received another health service request form from Plaintiff on April 16, 2011, in which Plaintiff requested a lower bunk accommodation.  Plaintiff was scheduled for a follow-up appointment with Dr. Win on April 21, 2011.

20.     Plaintiff was seen again by Dr. Win on April 21, 2011, who referred Plaintiff for a consultation with an outside orthopedic specialist for his right nee to rule out a right-knee meniscus tear.  Dr. Win also granted Plaintiff's request for a lower bunk accommodation, which Plaintiff received on June 14, 2011.

21.     The request for referral to an outside orthopedic specialist was approved on June 6, 2011, with an initial consultation with Dr. Casey scheduled for August 8, 2011.

22.     On May 19, 2011, Plaintiff filed a heath services request form for pain, indicating physical therapy was not helping, that Plaintiff had an MRI exam that day and wanted to know the results, and that this pain medication was not sufficient.

23.     On May 24, 2011, MRI scans showed that Plaintiff's knee was "grossly abnormal" with "multiple tear sites at the medial meniscus," "a partial detachment of the ACL from the femoral origin existed," and "there was a degeneration of the posterior horn lateral meniscus,"

24.     On June 2, 2011, Plaintiff was seen by Dr. Win for complaints of right knee pain.  Dr. Win prescribed acetaminophen with codeine for pain.

25.     On July 14, 2011, Plaintiff was seen again by Dr. Win, who indicate that he is still waiting for results of the orthopedic consult.  Plaintiff was provided a cane for mobility.

26.     On August 8, 2011, Plaintiff had a consultation with outside orthopedist, Dr. Casey.  Dr. Casey's notes indicate that Plaintiff said that his right knee pain has been increasing over the last few years, with increasing swelling and instability.  Plaintiff reported an inability to go up and down stairs in particular.  Dr. Casey recommended that Plaintiff receive an allograft ACL reconstruction and meniscectomy "sometime in the near future."  No specific date for indicated in Dr. Casey's report.

27.     On August 15, 2011, Dr. Win followed up with Plaintiff after his recent outside orthopedic consultation with Dr. Casey.  At the time, Plaintiff stated that he wanted to have the surgery recommended by Dr. Casey.  Plaintiff was prescribed Tramadol for pain.

28.     On September 27, 2011, Plaintiff was again seen by Dr. Win, who informed Plaintiff that surgery had been approved.

29.     Plaintiff underwent surgery on October 14, 2011.  The surgery was performed by Dr. Casey.  The surgery was indicated to have been successful.

30.     Following surgery, Plaintiff was returned to CSP-Solano and evaluated by Dr. Hseih.  On October 19, 2011, Plaintiff was seen by Dr. Lee, who reported that Plaintiff had been caught a few days prior "cheeking" pain medication.  Dr. Lee noted that Plaintiff appeared to have intentionally slid off his chair while checking Plaintiff's vitals.

/ / /

31.     Further post-surgical evaluations were conducted by Dr. Win on October 20, 2011, November 2, 2011, November 17, 2011, and January 6, 2012.

32.     Dr. Tan became Plaintiff's primary care physician on April 22, 2012, after Plaintiff was transferred to Facility B at CSP-Solano.  On May 25, 2012, Dr. Tan had a further post-surgery follow up with Plaintiff. At the time, Plaintiff's knee appeared normal, and Plaintiff was provided a knee brace and shoe insoles as further accommodations.  Plaintiff's lower bunk accommodation was renewed for another year.

33.     On July 27, 2012, Dr. Tan saw Plaintiff for swelling in his right knee.  Plaintiff stated his knee had given way a few weeks earlier. Dr. Tan ordered another x-ray of Plaintiff's knee.  The x-ray showed degenerative changes and a small joint effusion of fluid in the suprapatellar bursa.

34.     Plaintiff was seen again by Dr. Tan on August 6, 2012, for right knee pain.  Plaintiff was scheduled for a follow up appointment with Dr. Casey concerning a loose body in his right knee and a follow up request was generated for shoe insoles, which had not yet been provided. Plaintiff's prescription for Tramadol was renewed.

35.     On August 27, 2012, Plaintiff was treated again by Dr. Tan. Treatment notes indicate Plaintiff was provided his shoe insoles but refused to accept them because he did not like the ones provided.  Plaintiff was issued different gel insoles which he received that same day.

36.     On August 28, 2012, Plaintiff seen by Dr. Casey for a follow up appointment.  Dr. Casey stated that Plaintiff is doing well despite subjective complaints.  Dr. Casey ordered a follow-up MRI.

37.     On November 6, 2012, an MRI was performed on Plaintiff's right knee.  The study revealed a 13 mm loose body in the suprapatellar bursa.  Otherwise, the knee was normal.

38.     On November 30, 2012, Plaintiff was scheduled for a follow up appointment with Dr. Casey.

39.     Plaintiff attended a follow up appointment with Dr. Casey on December 12, 2012.  Dr. Casey indicated he would proceed with removal of the loose body in Plaintiff's right knee through another arthroscopic surgery.  Otherwise, Dr. Casey indicated the prior surgery was successful.

40.     Dr. Hsieh saw Plaintiff on December 14, 2012, and reported that Plaintiff refused Toradol and refused a lower tier transfer. He also refused to use his walker.

41.     Plaintiff underwent further arthroscopic surgery on his right knee on January 25, 2013, to remove the loose body.  At the time, the medial meniscus and articulating surfaces were visually inspected, along with the ACL, and Dr. Casey indicated they were in good repair.  The loose body removed was indicated to be a little larger than a pea, which Dr. Casey stated would have likely caused Plaintiff some minor

11

discomfort.

42.     After the second surgery, Plaintiff refused to use crutches and at times refused to take pain medications.

43.     X-ray imaging obtained after the second surgery indicated only mild degenerative changes since his ACL reconstruction.

44.     CSP-Solano policy requires that all new requests, increases, or changes in pain medication must be approved by the Pain Management Committee upon submission of a request by a primary care physician.

45.     Dr. Win did not intentionally or willfully seek to harm Plaintiff or delay medical treatment.

46.     Dr. Tan did not intentionally or willfully seek to harm Plaintiff or delay medical treatment.

47.     Nurse Fontillas did not intentionally or willfully seek to harm Plaintiff or delay medical treatment.

48.     Nurse Carlson did not intentionally or willfully seek to harm Plaintiff or delay medical treatment.

49.     Nurse Hardman did not intentionally or willfully seek to harm Plaintiff or delay medical treatment.

ECF No. 77-2.

**B.    <u>Plaintiff's Evidence</u>**

Plaintiff's response in opposition is largely a restatement of Plaintiff's claims.  <u>See</u> ECF No. 86.  Plaintiff relies on the following exhibits attached to Plaintiff's opposition:

| | | |
|---|---|---|
| <u>Exhibit A</u> | CDCR Form 7277.  ECF No. 86, pgs. 39-40. | |
| <u>Exhibit B</u> | Photo of "Loose Body."  ECF No. 86, pgs. 41-42. | |
| <u>Exhibit C</u> | Proof of Ongoing Knee Issues.  ECF No. 86, pgs. 43-64. | |

Plaintiff does not reproduce Defendants' itemized facts and does not admit or deny any of Defendants' itemized facts.  Plaintiff merely provides his account of the incident again.

Plaintiff failed to comply with Federal Rule of Civil Procedure 56 and Eastern District of California Local Rule 260(b) by not providing the required support for his assertions that a triable issue of fact exists.  Plaintiff did not cite particular parts of materials in the record, nor did he show that the materials cited do not establish the absence or presence of a genuine dispute.

1    Federal Rule of Civil Procedure 56(c)(1) states:

2    A party asserting that a fact cannot be or is genuinely disputed must
     support the assertion by:

3                    (A) citing to particular parts of materials in the record
     including depositions, documents, electronically stored information,

4    affidavits or declarations, stipulations (including those made for purposes
     of the motion only), admissions, interrogatory answers, or other materials;

5    or

6                    (B) showing that the materials cited do not establish the
     absence or presence of a genuine dispute, or that an adverse party cannot
     produce admissible evidence to support the fact.

7

8    Additionally, Eastern District Court of California's Local Rule 260(b) states in

9    relevant part:

10   Any party opposing a motion for summary judgment or summary
     adjudication shall reproduce the itemized facts in the Statement of

11   Undisputed Facts and admit those facts that are undisputed and deny those
     that are disputed, including with each denial a citation to the particular

12   portions of any pleading, affidavit, deposition, interrogatory answer,
     admission, or other document relied upon in support of that denial.

13

14   Further, Federal Rule of Civil Procedure 56(e) states:

15   If a party fails to properly support an assertion of fact or fails to properly
     address another party's assertion of fact as required by Rule 56(c), the

16   court may:
                     (1) give an opportunity to properly support or address the

17                       fact;
                     (2) consider the fact undisputed for purposes of the motion;

18                   (3) grant summary judgment if the motion and supporting
                         materials—including the facts considered undisputed—

19                       show that the movant is entitled to it; or
                     (4) issue any other appropriate order.

20

21           Here, Plaintiff failed to reproduce Defendants' undisputed facts, failed to admit or

22   deny Defendants' undisputed facts, and failed to cite to evidence that demonstrates the existence

23   of a genuine issue of material fact.  The Court considers Defendants' facts as undisputed for the

24   purposes of this motion.  Beard v. Banks, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to

25   challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is

26   deemed to have admitted the validity of the facts contained in the [defendant's] statement."); Brito

27   v. Barr, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020); see

28   also Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

                                                   13

1  ### III.  STANDARD FOR SUMMARY JUDGMENT

2          The Federal Rules of Civil Procedure provide for summary judgment or summary

3  adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

4  together with affidavits, if any, show that there is no genuine issue as to any material fact and that

5  the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

6  standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P.

7  56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

8  the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See

9  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

10  moving party

11          . . . always bears the initial responsibility of informing the district court of
        the basis for its motion, and identifying those portions of "the pleadings,
12        depositions, answers to interrogatories, and admissions on file, together
        with the affidavits, if any," which it believes demonstrate the absence of a
13        genuine issue of material fact.

14          Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

15          If the moving party meets its initial responsibility, the burden then shifts to the

16  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

17  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

18  establish the existence of this factual dispute, the opposing party may not rely upon the

19  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

20  form of affidavits, and/or admissible discovery material, in support of its contention that the

21  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

22  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

23  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

24  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

25  Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

26  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

27  (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

28  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

1  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

2  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

3  claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

4  of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

5          In resolving the summary judgment motion, the court examines the pleadings,

6  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

7  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

8  477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

9  court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

10  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

12  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

13  1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

14  judge, not whether there is literally no evidence, but whether there is any upon which a jury could

15  properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

16  imposed." Anderson, 477 U.S. at 251.

17

18                                    **IV.  DISCUSSION**

19          In their motion for summary judgment, Defendants argue that they are entitled to

20  judgment as a matter of law for the following reasons: (1) Plaintiff failed to cite to specific

21  evidence that supports that there is a genuine issue of material fact; (2) Defendants timely and

22  properly treated Plaintiff's right knee, adequately addressed Plaintiff's complaints of pain, and

23  appropriately provided a lower bunk accommodation upon request; and (3) Defendants are

24  entitled to qualified immunity.  See ECF No. 87, pg. 1, and ECF No. 77, pg. 1.

25          Plaintiff's non-compliance with the Federal Rules of Civil Procedure and Local

26  Rules regarding opposing a motion for summary judgment is discussed above.  Below the Court

27  discusses Defendants' remaining contentions.

28  / / /

1    **A.      Deliberate Indifference to Plaintiff's Serious Medical Needs**

2              The treatment a prisoner receives in prison and the conditions under which the

3    prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

4    and unusual punishment.   See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

5    511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

6    of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

7    (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

8    Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

9    "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

10   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

11   two requirements are met:  (1) objectively, the official's act or omission must be so serious such

12   that it results in the denial of the minimal civilized measure of life's necessities; and (2)

13   subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

14   inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

15   official must have a "sufficiently culpable mind."  See id.

16             Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

17   injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

18   see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

19   needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

20   Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

21   treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

22   wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

23   on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

24   also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

25   are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

26   whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

27   condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

28   1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns.  See McGuckin, 974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989).  The complete denial of medical attention may constitute deliberate indifference.  See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference.  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

1.      Defendant Tan

Prior to Plaintiff's ACL surgery and prior to Defendant Tan becoming Plaintiff's primary care physician, Defendant Tan reviewed Plaintiff's medical records, indicated in his report dated December 21, 2010, that Plaintiff had no active medications at the time of his transfer other than ibuprofen, that Plaintiff had a history of an ACL tear, and the Plaintiff should be scheduled for a follow-up appointment with his primary care physician in approximately four weeks.  See ECF No. 77-2, pg. 3.

After Plaintiff's surgery and after Defendant Tan became Plaintiff's primary care physician on or about April 22, 2012, Defendant Tan treated Plaintiff on May 25, 2012.  Id. at 7.  "The knee appeared normal, and Plaintiff was provided as a further accommodation a knee brace and shoe insoles for support."  Id.  Plaintiff's lower bunk accommodation was renewed for another year.  See id.

/ / /

17

1    On July 27, 2012, Defendant Tan treated Plaintiff for swelling in his knee.  See id.

2    Defendant Tan had already approved a renewal of Plaintiff's pain medications and ordered an x-

3    ray exam.  See id.  The x-ray exam indicated "degenerative changes existed and there was a small

4    joint effusion of fluid in the suprapatellar bursa."  Id.

5    On August 6, 2012, Defendant Tan saw Plaintiff for right knee pain and was

6    scheduled for a follow up appointment with another doctor concerning a loose body in Plaintiff's

7    right knee.  See id. at 7-8.  A request for shoe insoles was generated and Plaintiff's pain

8    medication was renewed again.  See id. at 8.

9    On August 27, 2012, Defendant Tan treated Plaintiff again.  See id.  Plaintiff

10    refused shoe insoles provided to him and was then issued different gel insoles.  See id.  After

11    Plaintiff received an MRI, Plaintiff had surgery to remove a loose body in Plaintiff's right knee.

12    See id.

13    Defendant Tan was at most negligent. There are no facts that demonstrate that

14    Defendant Tan in any way sought to intentionally inflict harm on Plaintiff or that Defendant Tan

15    was deliberately indifferent to Plaintiff's medical needs.  To the contrary, the undisputed facts

16    submitted by Defendants show that Defendant Tan consistently provided Plaintiff treatment.

17    Therefore, Defendant Tan is entitled to judgment as a matter of law.

18    2.    Defendant Fontillas

19    On December 27, 2010, Plaintiff was treated by Defendant Fontillas, after

20    submitting a request for health services.  See id. at 3.  "Plaintiff complained of chronic back pain

21    and was provided ibuprofen for this pain."  Id.  The plan was for Plaintiff to see the doctor to

22    discuss other needs, which Plaintiff did two weeks later.  See id.

23    On March 9, 2011, Defendant Fontillas reviewed another health services request

24    from Plaintiff, indicating Plaintiff would like to see Defendant Win, and Defendant Fontillas

25    noted that Plaintiff was scheduled to see Dr. Win the next day.  See id. at 4.

26    / / /

27    / / /

28    / / /

1            On April 16, 2011, Defendant Fontillas received a further healthcare services

2 request from Plaintiff to obtain a lower bunk accommodation.  See id. at 5.  Defendant Fontillas's

3 notes reflect that Plaintiff was scheduled for a follow-up appointment with Defendant Win on

4 April 21, 2011, who could address the lower bunk accommodation request.  See id.

5            The undisputed facts establish that Defendant Fontillas did nothing to give rise to a

6 constitutional claim.  Defendant Fontillas did not have the authority to change pain medications

7 or grant a lower bunk accommodation request.  See id. at 9.  Further, the undisputed facts simply

8 do not show that Defendant Fontillas intended to harm Plaintiff or that Defendant Fontillas

9 deliberately disregarded his medical needs.  Therefore, Defendant Fontillas is entitled to

10 judgment as a matter of law.

11            3.     Defendant Hardman

12            On January 4, 2011, Defendant Hardman responded to Plaintiff's health services

13 request form, indicating chronic right knee and lower back pain.  See id. at 5.  "Plaintiff's vitals

14 were taken, and the notes indicated that Plaintiff was scheduled for an appointment with

15 Plaintiff's primary care physician to occur on January 11, 2011."  Id.

16            "On May 19, 2011, Plaintiff filed another health services request form for pain,

17 indicating physical therapy was not assisting, that Plaintiff had an MRI exam that day and wanted

18 to know the results, and that his Tylenol 3 pain medication was not sufficient."  Id.  The response

19 from Defendant Hardman on May 24, 2011, indicated Plaintiff's vitals were taken, and Plaintiff

20 indicated his pain was a 6 out of 10.  See id.  "Plaintiff was referred back to his primary care

21 physician, Plaintiff's pain medication was refilled, and it was communicated to Plaintiff an

22 appointment was scheduled for June 2, 2011 with Dr. Win, which would allow time for the MRI

23 results to be obtained."  Id.

24            As with Defendant Fontillas, the undisputed facts establish that Defendant

25 Hardman did nothing to give rise to a constitutional claim.  Defendant Hardman did not have the

26 authority to change pain medications or grant a lower bunk accommodation request.  See id. at 9.

27 Further, the facts simply do not show that Defendant Hardman intended to harm Plaintiff or

28 deliberately disregarded his medical needs.  Therefore, Defendant Hardman is entitled to

1    judgment as a matter of law.

2           4.    Defendant Win

3           On January 11, 2011, Plaintiff was treated and evaluated by Defendant Win.  See

4    id. at 3.  "Dr. Win indicated Plaintiff had a right-knee meniscus injury, [sic] but stated it was

5    unlikely Plaintiff had an ACL tear."  Id.  "Dr. Win's notes stated the medical records did not

6    show any prior doctor had ordered an MRI or an orthopedic referral for Plaintiff's right knee."

7    Id.  Defendant Win noted that Plaintiff's gait was normal, undertook a physical assessment, and

8    noted that Plaintiff had no difficulty getting on and off the chair.  See id.  "Dr. Win noted further

9    that Plaintiff had a chronic right knee injury but needed to rule out an ACL tear.  Dr. Win ordered

10   Plaintiff to physical therapy, [sic] and provided a prescription for naproxen for Plaintiff's pain."

11   Id.

12          On March 10, 2011, Defendant Win saw Plaintiff who complained of further pain

13   in his right knee, which he indicated had been exacerbated due to another recent fall.  See id. at 4.

14   "Dr. Win ordered Plaintiff an x-ray, which was taken that same day."  Id.  The x-ray notes

15   indicated "no fracture, dislocation or focal osseous lesion, along with no joint effusion."  Id.

16   "The impression indicated 'negative knee.'"  Id.

17          Defendant Win requested Plaintiff be scheduled for an MRI and scheduled a

18   further x-ray to confirm that no metallic materials were in Plaintiff's body in order to clear

19   Plaintiff for an MRI.  See id.  The x-ray was done on March 25, 2011.  See id.

20          On April 21, 2011, Defendant referred Plaintiff to consult an orthopedic specialist

21   for his knee and granted Plaintiff's request for a lower bunk accommodation.  See id. at 5.

22   "Plaintiff received his lower bunk accommodation on June 14, 2011."  Id.

23          On June 2, 2011, Defendant Win prescribed acetaminophen with codeine for

24   Plaintiff's pain, which was approved by the Pain Management Committee.  See id. at 6.

25          On July 14, 2011, Plaintiff was seen by Defendant Win again, who indicated that

26   he was waiting the results of Plaintiff's orthopedic consult and provided Plaintiff with a cane for

27   mobility.  See id.

28   / / /

20

1    On August 15, 2011, after Plaintiff's orthopedic consult, Defendant Win treated

2    Plaintiff who elected to have surgery, and Defendant Win "prescribed Tramadol (Toradol)" for

3    his pain; a decision that was approved by the Pain Management Committee.  See id.

4    "Plaintiff had several other follow-up evaluations with Dr. Win and file consults

5    that occurred after Plaintiff's surgery.  This included evaluations on October 20, 2011, November

6    2, 2011, November 17, 2011, and January 6, 2012, with other file consults, prescription referrals

7    and file notes included in the same time frame." Id. at 7.

8    As stated above, Defendant Win provided Plaintiff treatment, pain medications,

9    and a lower bunk accommodation to address Plaintiff's medical issues.  Defendant Win thought

10   Plaintiff did not have a torn ACL but still provided Plaintiff with treatment and exams, which

11   ultimately lead to Plaintiff's surgeries.  The undisputed evidence shows that Defendant Win was

12   not deliberately indifferent.  At most, Defendant Win may have been negligent in not identifying

13   a torn ACL.  Defendant Win is entitled to judgment as a matter of law on Plaintiff's Eighth

14   Amendment deliberate indifference claims.

15                    5.    Defendant Braunger ("Carlson")

16   On January 28, 2011, Plaintiff was treated by Defendant Carlson for right knee

17   pain. See id. at 4.  Defendant's notes indicate that Plaintiff had been prescribed naproxen for his

18   pain, and Plaintiff should submit a health care services request form if his symptoms persist or his

19   pain increases. See id.  "Plaintiff was ambulatory and stable, [sic] and was returned to his

20   housing unit with a request that he follow up with the physician clinic shortly." Id.  "Plaintiff

21   described his pain level as a 6 plus out of 10." Id.

22   The undisputed evidence does not reflect any conduct by Defendant Carlson that

23   gives rise to a constitutional violation.  Defendant Carlson is entitled to judgment as a matter of

24   law.

25   / / /

26   / / /

27   / / /

28   / / /

1      **C.      Qualified Immunity**

2               Government officials enjoy qualified immunity from civil damages unless their

3      conduct violates "clearly established statutory or constitutional rights of which a reasonable

4      person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

5      qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

6      law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

7      immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

8      injury, the facts alleged show the defendant's conduct violated a constitutional right.  See Saucier

9      v. Katz, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether

10     the right was clearly established.  See id.  This inquiry "must be undertaken in light of the specific

11     context of the case, not as a broad general proposition . . . ." Id.  "[T]he right the official is

12     alleged to have violated must have been 'clearly established' in a more particularized, and hence

13     more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable

14     official would understand that what he is doing violates that right." Id. at 202 (citation omitted).

15     Thus, the final step in the analysis is to determine whether a reasonable officer in similar

16     circumstances would have thought his conduct violated the alleged right.  See id. at 205.

17              When identifying the right allegedly violated, the court must define the right more

18     narrowly than the constitutional provision guaranteeing the right, but more broadly than the

19     factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th

20     Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently

21     clear that a reasonable official would understand [that] what [the official] is doing violates the

22     right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

23     concludes that a right was clearly established, an officer is not entitled to qualified immunity

24     because a reasonably competent public official is charged with knowing the law governing his

25     conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

26     has alleged a violation of a clearly established right, the government official is entitled to

27     qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

28     did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

1   also <u>Saucier</u>, 533 U.S. at 205.

2             The first factors in the qualified immunity analysis involve purely legal questions.

3   <u>See</u> <u>Trevino v. Gates</u>, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

4   determination based on a prior factual finding as to the reasonableness of the government

5   official's conduct.  <u>See</u> <u>Neely v. Feinstein</u>, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

6   has discretion to determine which of the <u>Saucier</u> factors to analyze first.  <u>See</u> <u>Pearson v. Callahan</u>,

7   555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

8   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  <u>See</u>

9   <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir. 2003).

10            Qualified immunity shields government officials who, in the face of clearly

11   established law, acted reasonably but nonetheless violated some constitutional right.  As

12   discussed above, the undisputed evidence shows the Defendants did not violate Plaintiff's rights.

13   Therefore, qualified immunity is not an issue in this case.  And even if the Court concluded the

14   Defendants did violate a clearly established right, they would be entitled to qualified immunity

15   because the undisputed evidence shows that the Defendants acted reasonably by appropriately

16   treating Plaintiff's medical concerns and providing Plaintiff with a lower bunk accommodation.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

## V.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Moving Defendants' motion for summary judgment, ECF No. 77, be granted;

2.      Judgement be entered as a matter of law in favor of Defendants Tan, Fontillas, Hardman, Win, and Braunger ("Carlson"); and

3.      Non-moving Defendants Hannies, Kiesz, and Herhst be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to effect timely service of process.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 29, 2021

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE